UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Christopher Piper,

           Plaintiff,

vs.                                               REPORT AND RECOMMENDATION

Michael J. Astrue,
Commissioner of Social
Security,

           Defendant.          Civ. No. 06-3802 (PAM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the

Commissioner's final decision which denied his application for Disability Insurance

Benefits ("DIB").  The matter is now before the Court upon the parties' cross-Motions

for Summary Judgment.  The Plaintiff has appeared by Jennifer G. Mrozik, Esq., and

the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney.

For reasons which follow, we recommend that the Defendant's Motion for Summary

Judgment be denied, and that the Plaintiff's Motion be denied, and that this matter be

remanded to the Commissioner for further proceedings, in accordance with this Report.

## II. Procedural History

The Plaintiff first applied for DIB on June 3, 2003, at which time, he alleged that he had become disabled on December 28, 1998. [T. 56-58; 86]. The Plaintiff met the insured status requirement at the amended onset date of disability, and remained insured for DIB through December 31, 2004. [T. 61].

The State Agency denied the claims upon initial review, and upon reconsideration. [T. 21-24]. The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on July 11, 2005, a Hearing was conducted, at which time, the Plaintiff appeared, unrepresented by counsel. [T. 330-47]. Thereafter, on January 12, 2006, the ALJ issued a decision which denied the Plaintiff's claim for benefits. [T. 10-18]. The Plaintiff requested an extension of time for an Administrative Review before the Appeals Council, which was granted by letter dated June 13, 2006. [T. 8-9]. On July 19, 2006, the Appeals Counsel denied the Plaintiff's claim for review. [T. 5-7]. Thus, the ALJ's determination became the final decision of the Commissioner. See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir.

2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §404.981.

### III.  Administrative Record

A.     Factual Background.  The Plaintiff was forty-two (42) years old on the date of the Hearing.  [T. 334].  He has a Master's degree in Engineering and past relevant work experience as a teaching assistant at an academic center, project engineer, and senior process development engineer. [T. 99].  The Plaintiff last worked for 3M in 1999.  [T. 61, 72].  The Plaintiff alleges that he cannot work due to chronic back pain.  [T. 86].

1.     Medical Records. From November of 1998, through June of 2001, the Plaintiff was treated by various physicians, at the Oak Point Clinic, for a variety of routine health issues, including nasal congestion, sore throat, and allergies.  [T. 225-58].  In September and October of 1998, the Plaintiff was seen for a sore right knee, and was given anti-inflammatory medications.  [T. 135-36].

In January of 1999, the Plaintiff saw Dr. G. Peter Boyum complaining of low back pain after lifting a heavy machine component at work two (2) weeks earlier, in late December of 1998.  [T. 134].  The Plaintiff reported that he had not missed any work and, on examination, Dr. Boyum noted that the Plaintiff had no radiation of pain,

no weakness, and displayed no other symptoms of nerve compression, but moved stiffly to and from the examination table, and flexed his lumbar spine only approximately thirty (30) degrees, which was one-third (1/3) of normal. <u>Id.</u> Otherwise, the examination of the Plaintiff was normal, and Dr. Boyum found that he had symmetrical reflexes, no weakness, and no sensory abnormalities. <u>Id.</u> Dr. Boyum diagnosed lumbar strain, gave the Plaintiff a prescription for an anti-inflammatory medication, and referred him to physical therapy, and also instructed the Plaintiff that he could continue working. <u>Id.</u>

In March of 1999, the Plaintiff returned to see Dr. Boyum and reported gradual improvement with physical therapy. [T. 133]. Dr. Boyum noted that the Plaintiff was moving without difficulty, could flex forward one hundred percent (100%), and could return comfortably to an upright position. <u>Id.</u> The Plaintiff stated that he was working without any difficulty, and Dr. Boyum recommended that the Plaintiff should continue his moderate work restrictions for the next couple of weeks, with no lifting of more than fifty (50) pounds. <u>Id.</u>

In early May of 1999, the Plaintiff reported to Dr. Boyum that his back was getting "better and better," and that he was "essentially back at normal activities." <u>Id.</u> Dr. Boyum examined the Plaintiff and found that he had good motion and no

tenderness, and recommended that the Plaintiff be discharged from the clinic, noting that the Plaintiff should have "no permanent disability as a result of this resolving episode of lumbar strain." Id. The Plaintiff was advised that he should return to the clinic on an as-needed basis. Id.

Later, in May of 1999, the Plaintiff complained of back pain to Dr. Yakup Ozbek at the Oak Point clinic and, on examination, Dr. Ozbek observed that the Plaintiff's back appeared to be normal, with good movement. [T. 255].

In July of 1999, the Plaintiff returned to the St. Croix Orthopaedic Clinic and saw Dr. William T. Schneider for a reevaluation of his back pain. [T. 132]. The Plaintiff stated that his back pain had been improving, when he saw Dr. Boyum in May of 1999, but that he continued to experience vague low back discomfort with no radiation. Id. On examination, Dr. Schneider found that the Plaintiff exhibited no tenderness or spasm in his back region, and had a normal range of motion and negative straight leg raising. Id. Dr. Schneider referred the Plaintiff to physical therapy. Id. In August of 1999, the Plaintiff told Dr. Schneider that his back was "much better," and that he "barely has any discomfort" while taking Naprosyn, which

caused no side effects.[1]  [T. 131].  On examination, the Plaintiff exhibited no muscle spasms in his back,  and had a normal range of motion.  Id.  Dr. Schneider filled out a work ability form for the Plaintiff, which stated that he could return to work with no restrictions.  Id.

In December of 1999, the Plaintiff returned to see Dr. Schneider, again complaining of low back pain that was not eased by pain medications, including Naprosyn, as well as ibuprofen and acetaminophen.  [T. 130].  On examination, Dr. Schneider found that the Plaintiff had some flattened lordosis, but exhibited a completely normal range of motion, no trigger points, normal neurological examination, and negative straight leg raising.  Id.  The Plaintiff stated that he was "satisfied that he can do his regular job," and Dr. Schneider again completed a work ability form which stated that the Plaintiff could return to work with no restrictions. Id.  Dr. Schneider referred the Plaintiff to physical therapy, as the Plaintiff had responded well to that treatment in the past.  Id.  Also in December of 1999, the Plaintiff completed a low back pain questionnaire, in which he stated that painkillers gave him moderate relief from pain, that he had no difficulty engaging in personal

---

[1]Naprosyn is "indicated for the relief of the signs and symptoms of rheumatoid arthritis, * * * osteoarthritis, * * * and for the management of pain." Physician's Desk Reference, p. 2726 (62nd ed. 2008).

care, walking any distance or standing, that he could sit for an hour without pain, could sleep well with medication, and had a normal social life and recreational life, although he experienced some extra pain.  [T. 176].

The Plaintiff saw Dr. Phillips at the Oak Point Clinic, in January of 2000, complaining of epigastric pain and the symptoms of acid reflux.  [T. 249].  The Plaintiff reported taking anti-inflammatory medications for his back pain, and Dr. Phillips changed some of those medications, as he determined that they were the cause of his symptoms.  Id. On the same day, the Plaintiff saw Dr. Schneider, and reported that his pain continued to improve, and that Tylenol worked as well as the other pain medications, which were causing gastrointestinal complications for him.  [T. 129].  The Plaintiff also reported that he was seeing progress in his physical therapy exercises.  Id.

In April of 2000, the Plaintiff told Dr. Schneider that he was having reoccurrences of his back pain approximately every three (3) months.  Id.  Dr. Schneider noted that the Plaintiff was tender over the right side around L5, but that his examination was otherwise unremarkable, and he had a normal range of motion.  Id.  Dr. Schneider noted that the Plaintiff's symptoms were significant, and referred the Plaintiff to physical therapy, and to Dr. Ashish G. Shanbhag, for further

management.  Id.  Later, in April of 2000, the Plaintiff had an annual physical examination with Dr. Phillips, who found that the Plaintiff's examination was normal, and diagnosed the Plaintiff with obesity, allergic rhinitis and conjunctivitis, acid reflux, and chronic back pain.  [T. 241-42].

In early May of 2000, the Plaintiff saw Dr. Shanbhag for a consultative examination, and reported that his pain was mostly in the middle of his back, although Dr. Shanbhag noted that Dr. Schneider had previously reported that the Plaintiff's pain was predominantly on his right side.  [T. 125].  The Plaintiff stated that he took two (2) extra-strength Tylenol twice a day, and that treatment had helped "quite a bit" with his pain.  Id.  According to the Plaintiff, his pain did not cause him to wake in the night, was only intermittent and precipitated by sitting, and was relieved by activity.  [T. 125-26].  Dr. Shanbhag noted that the Plaintiff was working forty (40) hours a week as a mechanical engineer and, on examination, found that the Plaintiff had a mild antalgic gait, normal muscle strength and sensory examination, and normal range of motion.  [T. 126-27].

Dr. Shanbhag also found that the Plaintiff had some midline lumbar tenderness on the right side, and positive straight leg raising at sixty (60) degrees.  [T. 127].  Dr. Shanbhag ordered a lumbar MRI and stated that, depending on the findings, he would

consider interventional pain management, such as administering an epidural steroid injection. [T. 128]. The MRI of the Plaintiff's spine revealed degenerative disc disease at L5-S1, with moderate dehydration and a high signal intensity central and right paramidline annular tear, with moderate posterior bulging of the disc annulus, and no stenosis. [T. 119]. Subsequently, Dr. Shanbhag increased the Plaintiff's dosage of Elavil.[2] [T. 123-24].

In June of 2000, the Plaintiff saw Dr. Shanbhag for low back pain, and reported that he was doing "fairly well" on Relafen and Baclofen.[3] [T. 121]. Dr. Shanbhag diagnosed the Plaintiff with chronic back pain that was moderately to significantly palliated with oral medications. Id. Later, in June of 2000, the Plaintiff saw Dr. Stephen Wagner for a lumbar epidural injection. [T. 220]. The Plaintiff reported that he experienced isolated low back pain, which did not extend down his legs or radiate

---

[2]Elavil is a trademark for a preparation of amitriptyline hydrochloride, which is "used in the treatment of enuresis, chronic pain, peptic pain, and bulimia." Dorland's Illustrated Medical Dictionary, at pp. 62, 573 (29th Ed. 2000).

[3]Relafen is a trademark for a preparation of nabumetone, which is "used in the treatment of osteoarthritis and rheumatoid arthritis." Dorland's Illustrated Medical Dictionary, at pp. 1175, 1555 (29th Ed. 2000).

Baclofen is "used as a muscle relaxant and antispastic in the treatment of multiple sclerosis, spinal cord diseases, and spinal cord injury." Dorland's Illustrated Medical Dictionary, at p. 184 (29th Ed. 2000).

into his hips, and which worsened with leaning forward in a sitting position.  Id.  In July and August of 2000, the Plaintiff underwent two (2) additional lumbar epidural injections.  [T. 218-19].

In July of 2000, the Plaintiff saw Dr. Max E. Zarling, who is a neurosurgeon, for a consultative examination regarding his back complaints.  [T. 273].  The Plaintiff reported that he had suffered an injury at work, in December of 1998, and that epidural injections had helped him, and he stated that he felt "quite good" at that time. Id.  The Plaintiff also stated that he had pain in his mid-back that occasionally extended to the right side, was not associated with any leg pain or numbness or tingling, and improved with physical therapy.  Id.  On examination, Dr. Zarling found that the Plaintiff had a full range of lumbar motion with no pain, negative straight leg raising, normal motor examination, and normal sensory examination.  Id.  Dr. Zarling interpreted the Plaintiff's lumbar MRI to show some disc degeneration at L5-S1 with very slight disc protrusion, and noted that, since those were minor abnormalities, the Plaintiff should be treated conservatively.  Id.  Dr. Zarling additionally noted that the Plaintiff was doing well, and did not require another epidural injection.  [T. 274].

In October of 2000, the Plaintiff reported to Dr. Zarling's nurse that physical therapy was helping him, and that he was feeling better.  As a result, Dr. Zarling's

nurse noted that "we no longer need to see him." [T. 271]. In November of 2000, the Plaintiff returned to Dr. Wagner in order to obtain another lumbar epidural injection, and he stated that he had received a substantial degree of benefit from previous injections. [T. 217]. The Plaintiff returned for another lumbar injection in December of 2000, and in March of 2001. [T. 216, 215].

In May of 2001, the Plaintiff underwent x-rays of his lumbar spine and pelvis, with normal results. [T. 261]. In May and June of 2001, the Plaintiff underwent two (2) additional lumbar epidural injections. [T. 212-13]. Later, in May of 2001, the Plaintiff underwent a repeat lumbar MRI, which revealed that the Plaintiff had a moderate single level lumbar disc degeneration at L4-5, a high signal intensity right paracentral annular tear, and bulge, at that level, but without any disc herniated, stenosis, or impingement. [T. 277].

In early July of 2001, the Plaintiff saw Dr. Jerome K. Kennedy, who is a neurosurgeon, for a second opinion regarding his back pain. [T. 266]. The Plaintiff claimed that his pain was disabling, but reported that he was still working. Id. On examination, Dr. Kennedy found that the Plaintiff had normal gait and posture, and he made the same findings when he re-examined the Plaintiff in August of 2001. [T. 264, 266]. At that time, Dr. Kennedy noted that the Plaintiff's lumbar MRI of May

of 2001 showed mild degenerative changes at the L4-5 disc, and ordered a back brace for the Plaintiff.  [T. 266].  In January of 2002, Dr. Kennedy drafted a letter to the Plaintiff in which he stated that, since the Plaintiff had failed to follow through with his recommendations for conservative treatment, he was discharging him from his care with a copy of his medical records.  [T. 263].

In July of 2001, the Plaintiff saw Dr. Phillips with complaints of neck pain and stiffness, after being in a motor vehicle accident in May of 2001.  [T. 233-34].  Dr. Phillips recommended stretching exercises, ice application, gave him a prescription for Celebrex, and referred him to physical therapy to treat his back pain.[4]  [T. 234]. In September of 2001, the Plaintiff saw Dr. Yakup Ozbek with renewed complaints of neck pain, and he reported that physical therapy had not helped.  [T. 228].  On examination, Dr. Ozbek observed slightly spastic trapezius muscles, and found that the vertebra of the Plaintiff's upper and lower back were normal, with no major spasm.  [T. 228-29].  The Plaintiff was diagnosed with neck stiffness, which was

---

[4]Celebrex is "indicated for relief of the signs and symptoms of osteoarthritis, * * * rheumatoid arthritis in adults, * * * and for the management of acute pain in adults."  Physician's Desk Reference, p. 3066 (62nd ed. 2008).

secondary to strain from the automobile accident, and he was ordered additional physical therapy, and given Motrin and a prescription for Flexeril.[5]  [T. 229].

In October of 2001, the Plaintiff reported that his neck and back pain had "improved significantly," after he had undergone physical therapy and lost fifteen (15) pounds.  [T. 225].  In December of 2001, the Plaintiff presented as a new patient to Dr. Yanislav Wolfson, complaining of low back pain.  [T. 311-12].  On examination, Dr. Wolfson found that the Plaintiff's strength was "fully preserved" in all four (4) extremities, and he was able to bend forward and fully reach his toes, and bend backwards with a full range of motion, and that his torso tilting appeared normal.  [T. 311].  Dr. Wolfson additionally found that palpitation of the Plaintiff's spine showed minimal tenderness, and assessed the Plaintiff's problems as degenerative disc disease and neck pain, most likely due to a whiplash injury.  Id.  Dr. Wolfson referred the Plaintiff to physical therapy, and agreed with the Plaintiff's request for an additional back brace.  Id.  Dr. Wolfson expressly noted that he was refraining from making any

---

[5]Flexeril is a trademark for a preparation of cyclobenzaprine hydrochloride, which is "a compound structurally related to the tricyclic antidepressants, used as a muscle relaxant."  Dorland's Illustrated Medical Dictionary, at pp. 443, 685 (29th Ed. 2000).

recommendations concerning the Plaintiff's ability to work, as he would defer that decision to the occupational health specialist.  Id.

In January of 2002, the Plaintiff was seen by Dr. Wolfson, where he reported that the back brace had been very useful to him, and allowed him to bend freely.  [T. 310].  On examination, Dr. Wolfson found that the Plaintiff was able to bend forward and fully reach his toes, while his backward bending was only slightly limited by virtue of the back brace, and was, overall, within normal limits.  Id.  Later, in January of 2002, the Plaintiff reported that his physical therapy was working well, and that his pain medication was also effective, with no side effects.  [T. 308].  In March of 2002, the Plaintiff reported to his physicians that he had been discharged from the physical therapy program at Sister Kenny, and had been asked not to return to that program.  [T. 307].

In July of 2002, the Plaintiff saw Dr. Bruce Bonde concerning his back pain, and reported that back exercises had improved his condition.  [T. 303].  In September of 2002, the Plaintiff asked Dr. Christina Juhl to fill out his request for a handicapped driving sticker, as he claimed that he could not walk more than seventy-five (75) feet without stopping due to his back pain, and additionally, he asked Dr. Juhl to complete an application for disability benefits.  [T. 300].  Dr. Juhl provided the Plaintiff with

a parking sticker, but advised the Plaintiff that she did not know his entire medical history, and recommended that he follow up with the same physician so that he could have continuity of care.  [T. 300].  In November of 2002, Dr. Thomas Ferry advised the Plaintiff to continue with his weight loss, as that would help with his back pain, to continue weaning off his back brace, and to return to the clinic in six (6) months. [T. 299].

In January of 2003, the Plaintiff reported that he was able to ride a reclining bicycle for over twenty (20) minutes, and engage in other strengthening and stretching exercises for his back, and that he was "doing well." [T. 298].  Dr. Ferry advised the Plaintiff to return in four (4) to six (6) months, id., and the Plaintiff returned a week later with his attorney, who wanted to ask several questions of Dr. Ferry.  [T. 297].

The Plaintiff returned to see Dr. Ferry in April of 2003, and at that time, he requested a further evaluation of disability, and recommendations for partial or permanent disability as well as further work-up or treatment.  [T. 293].

In June of 2003, the Plaintiff reported that he had been involved in another motor vehicle accident and, although he claimed some stiffness in his neck, and shoulders, for a couple of days after the accident, in general he reported that he was feeling "pretty good."  [T. 292].

In September of 2003, the Plaintiff underwent a consultative physical examination with Dr. Ward R. Jankus. [T. 285-87]. The Plaintiff stated that he was taking extra-strength Tylenol, Celebrex, Baclofen, and amitriptyline.[6] [T. 285]. The Plaintiff alleged that he could walk less than a block, stand for about fifteen (15) to twenty (20) minutes at a time, sit for about two (2) hours before needing to adjust positions, and that bending aggravated his condition. Id. The Plaintiff further reported that his medications helped his condition, as did his back brace and physical therapy exercises. Id. On examination, Dr. Jankus found a mild to moderate tenderness on palpitation in the Plaintiff's lumbar region, but no muscle spasms, and a full range of motion throughout, with normal strength in both his upper and lower extremities. [T. 286]. The Plaintiff also reported a pulling sensation in his hamstring, with straight leg raising to fifty (50) degrees, but he made no radicular complaints. Id.

In October of 2003, the Plaintiff reported to Dr. Ferry that he was wearing his back brace for eleven (11) to thirteen (13) hours a day, that his comfort level was better, his neck improved, and that he was less mildly achy overall. [T. 290-921].

---

[6]Amitriptyline hydrochloride is "used in the treatment of enuresis, chronic pain, peptic pain, and bulimia." Dorland's Illustrated Medical Dictionary, at pp. 62, 573 (29th Ed. 2000).

The Plaintiff reported that he hoped to go back to school, and that he had been denied DIB.  [T. 290].

In November of 2003, Dr. Ferry drafted a letter in which he stated that the Plaintiff had applied for DIB, and he summarized the Plaintiff's medical history, including the Plaintiff's subjective complaints, and declined to offer any opinion regarding the Plaintiff's ability to work.  [T. 329].

In December of 2003, the State Agency physician reviewed the Record, including Dr. Jankus' mostly normal clinical findings, and concluded that the Plaintiff could perform light level work, could occasionally lift and carry up to twenty (20) pounds, and frequently lift and carry up to ten (10) pounds, and stand, sit, and walk about six (6) hours in an eight (8) hour workday.  [T. 315-323].

In February of 2004, the Plaintiff returned to see Dr. Ferry, and reported that his neck had improved, and had returned to essentially the same condition as it was prior to his motor vehicle accident.  [T. 328].  The Plaintiff continued to report back pain, and Dr. Ferry again recommended that the Plaintiff wean down his back brace usage.  Id.

In November of 2004, the Plaintiff reported to Dr. Ferry that he was ninety percent (90%) improved from his motor vehicle accident, in June of 2003, and his

physical examination was grossly normal.  [T. 327].  Dr. Ferry advised the Plaintiff

to return for an additional examination in six (6) months.  Id.

        2.  <u>Workers Compensation Decision Submitted Following the</u>

<u>Hearing</u>.  On September 6, 2005, the Plaintiff submitted the Findings and Order of a

Workers' Compensation Judge ("WCJ").  [T. 73-78].  The WCJ found that the

Plaintiff had sustained a temporary low back strain on December 28, 1998, from

which he had recovered by August of 1999, and that treatment, which he had received

for his back after August 1999, was not causally related to his work-related injury.

[T. 75].  The WCJ further found that the Plaintiff was ineligible for Workers'

Compensation benefits, as he was fired for reasons that were unrelated to his injury,

he withdrew from the labor market to attend college, and did not engage in a diligent

job search, and was not in an occupation that required significant lifting and carrying.

<u>Id.</u>

        B.  <u>Hearing Testimony</u>.  The Hearing on July 11, 2005, commenced with

some opening remarks by the ALJ, in which he noted the appearance of the parties for

the Record.  [T. 332].  The ALJ noted that the Plaintiff was not represented by

counsel, and asked the Plaintiff if he wanted a continuance of the Hearing, so that he

could obtain counsel.  [T. 332-33].  The ALJ explained that, if the Plaintiff were

granted a continuance, he would have to proceed with the Hearing within sixty (60) days, regardless of whether he retained counsel, and additionally, he explained that, if the Plaintiff opted to go forward with the Hearing unrepresented, he would be considered to have waived his right to counsel.  Id.  The Plaintiff replied that he would like to proceed without representation, and he signed the Waiver of Right to Representation form.  [T. 333].

The ALJ then swore the Plaintiff to testify, and noted that the Plaintiff was forty-two (42) years of age at the time of the Hearing, and that the Plaintiff alleged that he had become disabled on December 28, 1998.  [T. 334-35].  The Plaintiff explained that, on that date, he was injured at a 3M plant in Columbia, Missouri, while carrying a machine component, which caused him to suffer from low back pain. [T. 335].  The Plaintiff stated that he was subsequently terminated from his position at 3M "because they didn't have the confidence that [he] could continue to work."  Id.  The ALJ asked the Plaintiff if he had applied for Worker's Compensation, as a result of that accident, and the Plaintiff replied that he had, but that the case was not settled. [T. 335-36].  The ALJ asked the Plaintiff why his Worker's Compensation attorney was not representing him in his application for DIB, and the Plaintiff stated that his attorney had told him that he did not feel he would be able to help him in his DIB

application.  [T. 336].  The Plaintiff additionally confirmed that he had been involved in two (2) car accidents, that were documented in the Record.  Id.

Next, the ALJ asked the Plaintiff about his work history. [T. 337].  The Plaintiff explained that he had been employed by 3M as a mechanical engineer, and that he had a Bachelor's Degree, and a Master's Degree, in mechanical engineering from the University of Minnesota.  Id.  The ALJ asked the Plaintiff why, given his position, he was injured lifting mechanical parts, and the Plaintiff replied that it was an unusual accident, and that he had been asked by a supervisor to carry a machine component so as to determine if that act was safe for the mechanic who maintained the equipment to carry.  Id.  The ALJ then noted that the Record stated that the Plaintiff was still employed in 2001, and the Plaintiff explained that he continued to work for 3M until August of 1999, when he was terminated, and that he had no further employment beyond that date. [T. 338].  The Plaintiff added that he filed a Worker's Compensation claim, and 3M was paying for his medical care until 2001, when they terminated that coverage after an independent medical examination.  Id.  The ALJ then asked the Plaintiff if he had undergone any surgeries on his back, and he replied that he had not. [T. 339].  The ALJ observed that the Plaintiff had undergone eight (8) epidural steroid injections, had undertaken physical therapy, and had benefitted from wearing a back

brace, which he removed to exercise.  Id.  The ALJ further noted that the Plaintiff had

not worked for almost six (6) years, and asked him about other sources of income

during that period, and the Plaintiff explained that he had used his savings, and had

received some unemployment compensation, as well as a severance package from 3M.

Id.

Next, the ALJ noted that x-rays of the Plaintiff's spine had been negative for

abnormalities, and that the Plaintiff had been diagnosed with torn discs by Dr. Ferry.

[T. 340].  The Plaintiff explained that his original physician, Dr. Kennedy, had stated

that the Plaintiff did not require surgery, and could heal by using a back brace, and

that his current physician, Dr. Ferry, agreed that the Plaintiff would eventually heal

without surgery.  Id.  The ALJ noted that the Plaintiff's injuries had occurred more

than six (6) years previously, and that it appeared that the Plaintiff's condition had

stabilized, and asked the Plaintiff if any of his physicians had ever suggested that he

had achieved maximum medical improvement.  Id.  The Plaintiff testified that Dr.

Schneider had suggested that the Plaintiff had reached his maximum medical

improvement in 1999.  [T. 340-41].

The ALJ then stated that, given his education, the Plaintiff seemed capable of

finding work that did not require that he engage in lifting of any sort, and asked the

- 21 -

Plaintiff why he was unable to work.  [T. 341-42].  The Plaintiff responded that his physical capability was important to his work as a mechanical engineer, and that such a position also required travel, carrying equipment such as laptop computers and diagnostic equipment, bending, twisting, driving, and walking, and that he was unable to perform those tasks.  [T. 342].  The ALJ asked the Plaintiff about his plans to complete his Ph.D., and the Plaintiff replied that he was waiting for some improvement in his health to begin that program, and noted that he had been promised that, if he began such a program, he would be provided with a parking space that would be close to his classes, so that he would not have to walk very far.  Id.

The ALJ then swore the Vocational Expert ("VE") to testify.  Id.  The VE confirmed that he had reviewed the Record, and that he was familiar with jobs within the State of Minnesota.  Id.  The ALJ began by asking the VE about the exertional and skill level of an engineer, and the VE explained that engineering was a highly skilled position, with many transferrable skills.  [T. 343].

The ALJ then posed a hypothetical to the VE, and asked him to assume an individual of the Plaintiff's age, educational background, and work history experience, who could lift twenty (20) pounds occasionally, and ten (10) pounds frequently, sit and stand for six (6) hours, with an unlimited ability to push or pull, and with all the

posturals limited to occasional with the exception of balance, which was frequent.  Id.

The ALJ noted that the individual had a tear at the L4-5 and had multiple injections,

and asked the VE if this hypothetical individual could perform the Plaintiff's previous

relevant work.  Id.  The VE replied that he could perform past relevant work as a

professor of engineering, which is light skilled work.  Id.

The ALJ then asked the Plaintiff if he could get a job teaching undergraduate

or graduate classes in engineering at a community college, given his educational

background, and the Plaintiff acknowledged that he could, but that few community

colleges offered classes in engineering.  [T. 344].

The ALJ then asked the VE if there was any work in the regional or national

economy for a person with the Plaintiff's education and limitations, and the VE

advised that there were positions, such as information clerk, with in excess of 2,500

positions available in Minnesota.  [T. 345].  The ALJ asked the VE whether his

assessment would differ, if the hypothetical individual wore a back brace, and the VE

testified that his assessment would not change.  Id.

The ALJ then asked the Plaintiff to send him a copy of the Workers'

Compensation decision, which would be issued within sixty (60) days, and stated that

he would defer his decision until he had received that decision.  [T. 345-46].  The ALJ

- 23 -

noted that the Workers' Compensation decision was not controlling, but that he felt that it would be helpful to his decision.  [T. 346].  The ALJ then concluded the Hearing, and thanked the Plaintiff for his testimony.  Id.

C.    The ALJ's Decision.  The ALJ issued his decision on January 12, 2006. [T. 13-18].  As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §§404.1520.[7]  As a threshold matter,

---

[7]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

- 24 -

the ALJ concluded that the Plaintiff had not engaged in substantial gainful activity since his alleged onset date of December 28, 1998.  [T. 15].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise his ability to engage in work activity.  Id.  After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing, the ALJ found that the Plaintiff was severely impaired by mild degenerative changes in the lumbar spine, and cervical strain.  Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §§404.1520(d).  The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment, based on the Record as a whole.  Id.  He noted that he had reviewed the orthopedic Listings, and had found insufficient evidence of ongoing neurological loss so as to meet the Listings criteria. [T. 15-16].

The ALJ then proceeded to determine whether the Plaintiff retained the "residual functional capacity" ("RFC") to engage in the duties required by his past relevant work, or whether he was capable of engaging in other work which existed in

significant numbers in the national economy.  Id.  RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks.  See, Title 20 C.F.R. §404.1545, and Social Security Ruling 96-8p.  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §404.1529.

After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians; the objective medical evidence; and the Plaintiff's subjective complaints of pain; the ALJ determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk 6 hours of an 8 hour day, sit 6 hours of an 8 hour day, no limitations in pushing and pulling, but restricted to occasional climbing, stooping, kneeling, crouching, and crawling.

[T. 16]

The ALJ concluded that such an RFC was consistent with the weight of the Record, but was inconsistent with the Plaintiff's assertion that he had been disabled, by his physical impairments, from all work activity since December 28, 1998.  Id.

In determining the Plaintiff's RFC, the ALJ first considered the testimony of the Plaintiff, that he had been unable to work since December 28, 1998, because of torn discs that have failed to heal over six (6) years.  Id.  The ALJ noted that the Plaintiff had been involved in a wide range of conservative treatment modalities, and that his condition did not support surgery.  Id.  Furthermore, the Plaintiff testified that, although he had sufficient education to find a job, he felt that he was not capable of finding work as he could not drive, walk, travel, or carry light items, such as a laptop computer, and he stated that he planned to pursue further education.  Id.

Weighing the evidence in the Record, the ALJ found that the Plaintiff's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the Plaintiff's statements regarding the intensity, duration, and limiting effects of those symptoms, was not credible.  Id.  Specifically, the ALJ noted that the Plaintiff's subjective complaints were inconsistent with the objective medical record.  Id.  After his work-related back injury in December of 1998, the Plaintiff's treating physician, Dr. Boyum, prescribed physical therapy which resulted

in the gradual improvement in the Plaintiff's symptoms and, by May of 1999, the Plaintiff had returned to normal activities with good motion and no tenderness, and was discharged from care with no evidence of permanent disability.  Id.

In July of 1999, the Plaintiff was re-evaluated by Dr. Schneider for residual discomfort, with a normal examination, and Dr. Schneider suggested additional physical therapy, and a home exercise program.  Id.  The Record disclosed that the Plaintiff did well on that regimen, although he continued to experience some recurring discomfort.  Id.  In May of 2000, Dr. Shanbhag questioned the disc irritation, and a follow-up MRI showed degenerative disc disease at L5-S1, with moderate dehydration and a high signal intensity central and right para-midline annular tear, with mild posterior bulging of the disc annulus.  [T. 16-17].  Dr. Shanbhag recommended that the Plaintiff try epidural steroid injections, and additionally, that he continue with physical therapy, and he discharged the Plaintiff from his care in October of 2000, with some improvement in his condition.  [T. 17].  The ALJ further noted that, in 2001, the Plaintiff had a neurosurgical consultation, and in May of 2001, he was involved in a motor vehicle accident which gave rise to neck pain and stiffness.  Id.  On examination, the Plaintiff showed a full range of motion in his neck and shoulders, along with normal muscle strength and muscle tone, and normal sensation and deep

tendon reflexes, and a lumbar and pelvis film was negative.  Id.  The Plaintiff was treated conservatively with physical therapy, and a repeat MRI was stable, when compared to the previous scan, and showed only mild degenerative changes.  Id.  In July of 2001, the Plaintiff was fitted with a back brace by Dr. Kennedy, who also recommended that the Plaintiff participate in a neck and back program, and a follow up discogram showed concordant pain at L4-5 and L5-S1.  Id.

The Record disclosed that, in December of 2001, the Plaintiff saw Dr. Wolfson, who prescribed conservative treatment.  Id.  In June of 2003, the Plaintiff was involved in a second motor vehicle accident, and continued with conservative treatment. Id. In September of 2003, the Plaintiff had a consultative examination with Dr. Jankus, who noted that the Plaintiff was taking Tylenol, Celebrex, Baclofen, amitriptyline, and using a back brace, and observed that the Plaintiff had a full range of motion, with the exception of forward flexion, with mild to moderate tenderness to palpitation across the lumbosacral junction, limited straight leg raising to about fifty (50) degrees, without radicular type complaints, and intact pinprick sensation. Id. Dr. Jankus further found that the Plaintiff's gait was smooth but cautious, and follow-up x-rays were negative.  Id.

In arriving at the Plaintiff's RFC, the ALJ considered all of the medical opinions in the Record, and placed significant weight on the opinions of the Plaintiff's treating sources, as well as the opinion of Dr. Jankus, who appeared as the consultative examining physician, which were supported by objective findings. Id. In contrast, the ALJ found that Dr. Ferry's opinion, in his letter dated November 28, 2003, was not supported by objective findings. Id. In addition, the ALJ reviewed the primary and specialized care records, and found no progression of objective findings, or a clear correlation to his symptoms, no evidence of a surgical lesion, and no diagnostic studies that showed more than mild findings. Id. The ALJ placed some consideration on the opinions of the non-examining State Agency physicians, as a reasonable analysis of the Record at the time that they reviewed it, and concluded that the weight of the Record supported the Plaintiff's RFC. Id.

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis, inclusive of the RFC that the ALJ had determined, that the Plaintiff would be able to perform his past relevant work. [T. 17-18]. The ALJ noted that such a finding was consistent with the testimony of the VE. [T. 18]. The ALJ found that the Plaintiff was a younger individual on the alleged disability onset date, has a Master's Degree and is able to communicate in English, and has a skilled work background and

transferable skills.  Id.  The ALJ considered the Plaintiff's age, education, work experience, and RFC, and found that the Plaintiff possessed work skills, from his past relevant work, that were transferrable to other occupations with jobs existing in significant numbers in the national economy.  Id.

The ALJ noted the VE's testimony that a hypothetical individual, with skills similar to the Plaintiff's, could also perform the job of information clerk, with 2,500 positions available.  Id.  Based upon the testimony of the VE, and after taking into consideration the Plaintiff's age, educational background, and RFC, the ALJ concluded that the Plaintiff was not disabled at any time from December 28, 1998, through the date of the decision, which was January 12, 2006.  Id.

## IV.  Discussion

A.    Standard of Review.  The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal

Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed. See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998). On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied. See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001). Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006).

Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  <u>Vandenboom v. Barnhart</u>, 421 F.3d 745, 749 (8th Cir. 2005), quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004); <u>Howard v. Massanari</u>, 255 F.3d 577, 581 (8th Cir. 2001), quoting <u>Mapes v. Chater</u>, 82 F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, <u>Harris v. Shalala</u>, 45 F.3d 1190, 1193 (8th Cir. 1995); <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, <u>Hacker v. Barnhart</u>, 459 F.3d 934, 936 (8th Cir. 2006), citing <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th Cir. 1994); see also, <u>Haley v. Massanari</u>, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir. 1995), or 'because

we would have decided the case differently.'"), quoting <u>Holley v. Massanari</u>, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record <u>de novo</u>.  See, <u>Hilkemeyer v. Barnhart</u>, 380 F.3d 441, 445 (8th Cir. 2004); <u>Flynn v. Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996).

B.    <u>Legal Analysis</u>. In support of his Motion for Summary Judgment, the Plaintiff advances the following arguments:

> 1.    That the ALJ failed to develop the Record of an unrepresented claimant;
>
> 2.    That the ALJ failed to give the proper weight to the opinions of the Plaintiff's treating physicians; and
>
> 3.    That the ALJ failed to properly evaluate the Plaintiff's credibility.

See, <u>Plaintiff's Memorandum</u>, <u>Docket No. 19</u>, at 10.

We address each contention below.

> 1.    <u>Whether the ALJ Erred in Failing to Develop the Record of an Unrepresented Claimant</u>.
>
>> a.    <u>Standard of Review</u>.  A claimant has a statutory right to

counsel at his Hearing.  See, <u>Title 42 U.S.C. §406(a)(1)</u>; <u>20 C.F.R. §404.1700</u>.  "The

- 34 -

absence of counsel, however, does not in itself deprive a claimant of a fair hearing." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994), citing Highfill v. Bowen, 832 F.2d 112, 114 (8th Cir. 1987).   The claimant may waive the right to counsel "if provided sufficient information to enable her to knowingly and intelligently choose whether to retain counsel or proceed pro se." Filipi v. Shalala, 1994 WL 706692 at *2 (D. Minn., September 30, 1994)(citing cases); see also, Rush v. Barnhart, 432 F. Supp. 2d 969, 1003-04 (D.S.D. 2006).

It is well-established that "[a] social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); Walz v. Barnhart, 2004 WL 742042 at *4 (D. Minn., March 31, 2004) . However, while "[c]laimants, especially those not represented by counsel, can hardly be expected to be familiar with the intricacies of the Secretary's Guidelines," the ALJ is charged only with developing a reasonable record, and "is not required to function as the claimant's substitute counsel." Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994), quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982); Shepherd v. Chater, 89 F.3d 841 *1 (8th Cir. 1996)(Table Decision).

"'[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" Warburton v. Apfel, 188 F.3d1047, 1051 (8th Cir. 1999), quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994)("The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.").

      b.   Legal Analysis. The Plaintiff argues that the ALJ erred in failing to contact Dr. Ferry in order to obtain updated medical records, despite the Plaintiff's testimony, at the Hearing in June of 2005, that he continued to receive treatment from Dr. Ferry. In addition, the Plaintiff argues that the ALJ should have obtained the opinion of a medical expert ("ME"), concerning medical evidence that was submitted after the Record was evaluated by the State physicians. See, Plaintiff's Memorandum, supra at pp. 7, 10-13.

As to the first issue, the Plaintiff asserts that, given the incompleteness of the Record at the time of the Hearing, the ALJ had an obligation, at a minimum, to contact Dr. Ferry for additional evidence or clarification, and for an assessment of the ways

in which the Plaintiff's impairments limited his ability to engage in work-related

activities. Social Security Ruling 96-5p[8] provides as follows:

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

61 F.R. 34471, 34474, 1996 WL 362206 (July 2, 1996).[9]

---

[8]Although the Plaintiff cites Social Security Regulation 85-16 in support of his claim, that an ALJ has an obligation to make "[e]very reasonable effort * * * to obtain all medical evidence from the treating source before obtaining evidence from any other source on a consultative basis," that Regulation applies only to RFC assessments for alleged mental impairments under SSI, which the Plaintiff is not claiming here.

[9]The same result follows from 20 C.F.R. §§404.1512(e), which provides as follows:

> *Recontacting medical sources*. When the evidence we received from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions. (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or

Of course, we are mindful that "[t]he ALJ is required to recontact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim," Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004), citing 20 C.F.R. §§416.912(e), and we cannot find that to be the case here.

We understand the Plaintiff to argue that the ALJ was required to contact Dr. Ferry, so as to ascertain whether medical records existed, subsequent to the latest submission on the Record, which was dated March of 2005. [T. 325].  However, as the Defendant notes, even if such records existed, they would be irrelevant, as they would not go to establish that the Plaintiff had a physical impairment prior to the date that he was last insured, which was December 31, 2004, which was anticipated to last for at least twelve (12) months, or result in death.  See, Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984)("[T]he burden  is on the claimant to show the existence of a disability on or before the date that the insurance coverage expires.").

Although, in support of his Motion, the Plaintiff cites to Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002), there, our Court of Appeals found that an ALJ

_____

does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

had an obligation to recontact a treating physician, who had opined that the plaintiff suffered from constant, limiting pain, when the treatment notes that were submitted prior to the Hearing were "somewhat cursory," and consisted of brief notes recording office visits, and prescription refills.  Significantly, the treatment notes in Bowman, supra,  pertained to the period prior to the expiration of insured period, and therefore, were relevant to the ALJ's ultimate determination of disability.  In contrast, here, the Plaintiff has not suggested that the Record before the ALJ omitted any of the relevant treatment, and diagnostic information, which existed prior to December 31, 2004, and which is all that the ALJ could properly rely upon in making his determination regarding the nature and severity of the Plaintiff's alleged impairments.  A "reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial," Snead v. Barnhart, 360 F.3d 834, 839 (8th Cir. 2004), citing Shannon v. Chater, supra at 488, and we find that the Plaintiff has not suffered any prejudice by the ALJ's failure to contact Dr. Ferry so as to obtain medical records that were generated after the expiration of the insured period.[10]

---

[10]Although we find that the ALJ's failure to contact Dr. Ferry is not reversible error, we express some discomfort with the ALJ's failure to ask Dr. Ferry to provide a less ambiguous opinion concerning the Plaintiff's RFC.  As we have previously noted, "[t]he regulations do not require an ALJ to recontact a treating physician whose opinion was inherently contradictory or unreliable," however, here, no opinion at all

Next, the Plaintiff argues that, on a finding that the claimant's impairments do not meet the Listings criteria, the ALJ is required to determine whether the claimed impairments were medically equivalent to a Listed Impairment by obtaining an updated medical opinion from an ME. Specifically, the Plaintiff notes that Social Security Ruling 96-6p provides that updated medical information should be obtained, from an ME, under the following circumstances:

> When no additional medical evidence is received, but in the opinion of the [ALJ] * * * the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or
>
> When additional medical evidence is received that in the opinion of the [ALJ] * * * may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

Social Security Ruling 96-6p.

---

was provided, and consequently, we remind the ALJ that "[t]he regulations provide that [he] should recontact a treating physician when the information the physician provides is inadequate for the ALJ to determine whether the applicant is actually disabled." See, 20 C.F.R. §§404.1512(e)-(e)(1); Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006). For reasons we later detail, we recommend that this matter be remanded to the Commissioner on other grounds, and we merely note, now, that on remand, the ALJ may wish to obtain a more definitive statement from Dr. Ferry concerning the extent to which the Plaintiff's impairments affect his ability to engage in work-related activities.

- 40 -

"When an updated medical judgment as to medical equivalence is required at the [ALJ] level in either of the circumstances above, the [ALJ] must call on a medical expert." Id.

Although it is not entirely clear from his Memorandum, the Plaintiff's argument is apparently that, as medical evidence was submitted to the Record after the State Agency physicians completed their evaluation, in December of 2003, the ALJ was required to consult an ME concerning the supplemental evidence. However, the argument misinterprets the mandate of SSR 96-6p, which only requires an ALJ to obtain the opinion of an ME if the supplemental medical evidence, that was introduced to the Record after the State Agency physicians conducted their review, challenges their expert opinion that an impairment is not equivalent to a Listing. See, Nelson v. Astrue, 2008 WL 822157 at *19 (D. Minn., March 26, 2008); Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 978-79 (8th Cir. 2003).

In his decision, the ALJ gave appropriate consideration to the opinions of the State Agency physicians, "as a reasonable analysis of the record at that time," but went on to consider the medical evidence that was submitted to the Record after December of 2003, and found that the sum total of the evidence supported his finding that the Plaintiff did not have an impairment that met or was medically equivalent to

a Listed Impairment.  [T. 15, 17].  As provided in SSR 96-6p, the ALJ is only required to obtain an ME opinion when he finds that evidence, that was submitted after the State Agency physician evaluation of the Record, would change their opinion regarding medical equivalency of a Listing.  Here, the ALJ found that nothing in the Record would support such a change in their analysis, and we agree, and find that the ALJ's failure to obtain an ME opinion is not reversible error.

      2.    <u>Whether the ALJ Failed to Give Proper Weight to the Opinion of the Plaintiff's Treating Physicians</u>.

      a.    <u>Standard of Review</u>.  When a case involves medical opinion -- which is defined as "statements from physicians and psychologists or other acceptable medical sources" -- the opinion of a treating physician must be afforded substantial weight.  <u>20 C.F.R. §§404.1527 and 416.927</u>; see also, <u>Forehand v. Barnhart</u>, 364 F.3d 984, 986 (8th Cir. 2004); <u>Burress v. Apfel</u>, 141 F.3d 875, 880 (8th Cir. 1998); <u>Grebenick v. Chater</u>, 121 F.3d 1193, 1199 (8th Cir. 1997); <u>Pena v. Chater</u>, 76 F.3d 906, 908 (8th Cir. 1996).  Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive.  See, <u>Forehand v. Barnhart</u>, supra at 986 ("A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical and diagnostic

data."), quoting <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998).  An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole. See, <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997); <u>Pena v. Chater</u>, supra at 908; <u>Ghant v. Bowen</u>, 930 F.2d 633, 639 (8th Cir. 1991); <u>Kirby v. Sullivan</u>, 923 F.2d 1323, 1328 (8th Cir. 1991); <u>Ward v. Heckler</u>, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence.  See, <u>Rogers v. Chater</u>, supra at 602; <u>Ward v. Heckler</u>, supra at 846.  In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces her otherwise.  <u>Id.</u>  As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement.  See, <u>Piepgras v. Chater</u>, 76 F.3d 233, 236 (8th Cir. 1996), citing <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir. 1991).  Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion.  <u>Id.</u>; <u>Metz v. Shalala</u>, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician.  The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole."  See, 20 C.F.R. §§404.1527(d)(4) and 416.927(d)(4).  More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  See, 20 C.F.R. §§404.1527(d)(5) and 416.927(d)(5).  When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments.  See, 20 C.F.R. §§404.1527(d)(2)(ii) and 416.927(d)(2)(ii).  Further, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not to be given any weight by the ALJ.  See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1).

      b.    Legal Analysis.  The Plaintiff alleges that the ALJ erred in failing to give controlling weight to Dr. Ferry's opinion, since Dr. Ferry was his primary care

physician, and treated the Plaintiff for all of his conditions.  In addition, the Plaintiff alleges that the ALJ failed to show that the opinions of his treating physicians were significantly inconsistent with the Record.

As an initial matter, we note that, in November of 2003, Dr. Ferry drafted a letter in which he summarized the Plaintiff's medical history, including the Plaintiff's subjective complaints, and observed that the Plaintiff had difficulty walking due to back pain, but declined to offer any opinion regarding his ability to work.  [T. 329]. In subsequent visits in February of 2004, and again in November of 2004, Dr. Ferry noted that the Plaintiff's condition had improved, and his physical examination was grossly normal. [T. 327-28].

As previously noted, the ALJ need not give any weight to a treating physician's conclusory statements regarding total disability.  See, 20 C.F.R. §§404.1527(e)(1), and 416.927(e)(1); Rogers v. Chater, supra at 602.  If justified by substantial evidence in the Record as a whole, the ALJ can discount the treating physician's opinion.  See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846. In regard to the Plaintiff's physical ailments, it is important to note that, here, the ALJ did not entirely disregard the opinion of Dr. Ferry.  Rather, he determined that Dr. Ferry's opinion was

inconsistent with the Record as a whole, which revealed only mild symptoms, and non-surgical treatment.  [T. 17].

Although the Plaintiff argues that the ALJ failed to show significant inconsistencies in the Record with regard to the Plaintiff's treating physicians, the ALJ considered the entirety of the Record, and found that, while the Plaintiff had been diagnosed with chronic back pain, his physicians recommended only conservative treatment, and recorded essentially normal findings.  Id.  Specifically, the ALJ noted that, even though the Plaintiff initially reported a work-related back injury in December of 1998, his conditioned improved with physical therapy and, by May of 1999, he had returned to normal activities with good motion and no tenderness.  [T. 16].  While the Plaintiff reported some residual discomfort in July of 1999, that was also treated with physical therapy, and an MRI, in 2000, disclosed degenerative disc disease, that was treated with epidural steroid injections and further physical therapy. [T. 16-17].  After a motor vehicle accident in May of 2001, the Plaintiff was given a repeat MRI scan, which revealed only mild degenerative changes and, in July of 2001, the Plaintiff was prescribed a back brace.  [T. 17].  Although the Plaintiff was involved in a second motor vehicle accident in July of 2003, he continued with conservative treatment, and was treated with medications and a back brace.  Id.

- 46 -

In sum, we find that the ALJ thoroughly considered, and weighed, all of the medical evidence before him, and properly discounted Dr. Ferry's opinion of November 28, 2003, concerning the Plaintiff's state of disablement, in favor of the assessments of the other reviewing and treating physicians, and the Record as a whole, and therefore, we find no error, and decline to recommend a reversal on that ground. See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846.

    3.    Whether the ALJ Improperly Assessed the Plaintiff's Credibility.

    a.    Standard of Review.   The governing law makes clear that credibility determinations are initially within the province of the ALJ.  See, Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006)("Where adequately explained and supported, credibility findings are for the ALJ to make."), quoting Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000), citing Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir. 2000); see also, Driggins v. Bowen, 791 F.2d 121, 125 n. 2 (8th Cir. 1986); Underwood v. Bowen, 807 F.2d 141, 143 (8th Cir. 1986).  As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole. See, Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007)("We do not reweigh the evidence presented to the ALJ, and we defer to the ALJ's determinations regarding the credibility of testimony, as long as these determinations are supported by good

reasons and substantial evidence."), citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006); see also, Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the specific testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony. See, Eichelberger v. Barnhart, supra at 590 ("The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints."); Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Shelton v. Chater, 87 F.3d 992, 995 (8th Cir. 1996); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Ricketts v. Secretary of Health and Human Services, 902 F.2d 661, 664 (8th Cir. 1990). These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ. See, Johnson v. Secretary of Health and Human Services, 872 F.2d 810, 814 n.3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by Polaski v. Heckler, supra, and its progeny. See, e.g., Flaherty v. Halter, 182 F. Supp. 2d 824, 829 (D. Minn. 2001); Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir.

1996); Shelton v. Chater, supra; Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996).

Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

1.  the claimant's daily activities;

2.  the duration, frequency, and intensity of the pain;

3.  precipitating and aggravating factors;

4.  dosage, effectiveness and side effects of medication;

and

5.  functional restrictions.

Polaski v. Heckler, supra at 1321-22; see also, Gonzales v. Barnhart, supra at 895 (listing factors for credibility analysis); Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006)(same).

The ALJ must not only consider those factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole. Cf., Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991); Carlock v. Sullivan, 902 F.2d 1341 (8th Cir. 1990). "However, the ALJ need not explicitly discuss each Polaski factor." Eichelberger v. Barnhart, supra at 590, citing Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). "The ALJ only need

acknowledge and consider those factors before discounting a claimant's subjective complaints." Id.

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain, or other subjective symptoms, solely because there is no objective medical evidence to support them. See, Ostronski v. Chater, supra at 418; Jones v. Chater, supra at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1994)(ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain). "Although 'an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [claimant's] subjective pain complaints are not credible in light of objective medical evidence to the contrary.'" Gonzales v. Barnhart, supra at 895, quoting Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002)[internal citation omitted].

It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual. See, Simonson v. Schweiker, 699 F.2d 426, 429 (8th Cir. 1983). For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or

whose physical condition, due to * * * general physical well-being is generally deteriorated." O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); see also, Landess v. Weinberger, 490 F.2d 1187 (8th Cir. 1974).  Given that variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole.  See, Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Johnson v. Chater, supra at 944.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied.  For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling.  See, Dukes v. Barnhart, supra at 928; Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Barrett v. Shalala, supra at 1023.  By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility."  Pena v. Chater, supra at 908; see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997)(ALJ may discredit complaints that are inconsistent with daily activities); Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996); Shannon v. Chater, supra at 487.

- 51 -

Among the daily activities, which counterindicate disabling pain, are: a practice of regularly cleaning one's house, <u>Spradling v. Chater</u>, 126 F.3d 1072, 1075 (8th Cir. 1997); <u>Chamberlain v. Shalala</u>, supra at 1494; cooking, <u>id.</u>; doing yard work, <u>Swope v. Barnhart</u>, 436 F. 3d 1023, 1024 (8th Cir. 2006); and grocery shopping, <u>Johnson v. Chater</u>, 87 F.3d 1015, 1018 (8th Cir. 1996). Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider in the evaluation of subjective complaints of pain. See, <u>Wilson v. Chater</u>, 76 F.3d 238, 241 (8th Cir. 1996).

b.    <u>Legal Analysis</u>. The Plaintiff alleges that the ALJ erred in basing his appraisal of the Plaintiff's credibility solely upon the medical evidence and, in doing so, the ALJ failed to consider the other <u>Polaski</u> factors. We agree, and find that this aspect of the ALJ's analysis constitutes reversible error.

Unquestionably, the ALJ understood his obligation, under <u>Polaski</u>, to undertake a principled evaluation of the Plaintiff's subjective complaints. [T. 16]("Since he is alleging disability, in part, on the basis of subjective complaints, the undersigned has evaluated his testimony and the entire record within the provisions of Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984), 20 C.F.R. 404.1529, and Social Security Ruling 96-7p."). Moreover, the ALJ found that the Plaintiff's "medically

determinable impairment could reasonably be expected to produce the alleged symptoms." Id. However, without a disciplined analysis, the ALJ simply concluded that the Plaintiff's "statements concerning the intensity, duration, and limiting effects of these symptoms are not entirely credible." Id. Failing to specify which statements were not entirely credible, the ALJ simply recited the Plaintiff's objective, and not so objective, medical findings. In this, we find error.

Necessarily, we accept that an "ALJ may not rely solely on the lack of objective medical evidence," but that "such evidence is one 'factor' that he may consider, * * * and medical records include more than objective findings." Ford v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008). Further, we recognize that "the ALJ's decision need not include a discussion of how every Polaski factor relates to the claimant's credibility," Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004), and that the ALJ is empowered to "discount subjective complaints of pain if they are inconsistent with the evidence as a whole." Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007), citing Polaski v. Heckler, supra at 1322. However, our Court of Appeals has routinely demanded an exacting assessment of a Social Security claimant's believability. See, e.g., Steed v. Astrue, 524 F.3d 872, 875 n. 4 (8th Cir. 2008)("In Polaski, we held that when evaluating a claimant's credibility, in addition to considering the absence of objective

medical evidence to support complaints of pain, an ALJ should consider a claimant's reported daily activities, the duration, frequency and intensity of his or her pain, precipitating and aggravating factors, medication, and functional restrictions."), citing Polaski v. Heckler, supra at 1322.

Here, the ALJ's analysis is devoid of any consideration of any factor apart from the Plaintiff's medical records.  As the Commissioner properly highlights, the Plaintiff was employed, sometimes full-time, during the period in which he claimed to be disabled.  However, the ALJ did not address that circumstance but, rather, found  that there was "no evidence of disqualifying substantial gainful activity."  [T. 15].  No where does the ALJ address the Plaintiffs activities of daily living, the Plaintiff's work history, or the observations of third parties, inclusive of the ALJ's own observations.[11]

---

[11]As but a few examples, the ALJ wholly failed to address that portion of the Plaintiff's clinical records which report his claim that his back pain interferes with his daily life, such as Dr. Ferry's note, from February of 2004, that the Plaintiff reported difficulty in reading because of back and neck pain [T. 328], and the clinical note, from October of 2002, that he reported difficulty in walking distances of more than seventy-five (75) feet.  [T. 300].  Our function, on review, is not to ferret out any counter-indicative evidence, but rather, is to assure that the ALJ's rejection of a claimant's complaints is for good and explicit reasons.  See, Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001)("We will not disturb the decision of an [ALJ] who seriously considers, but for good reasons explicitly discredits, a claimant's testimony of disabling pain."), citing Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996), quoting, in turn, Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).

See, Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007)("The ALJ's personal observations of the claimant's demeanor during the hearing [are] completely proper in making credibility determinations."), quoting Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001).[12]

The Plaintiff urges us to find that the ALJ's decision was not supported by substantial evidence, and therefore, to recommend an award of benefits. However, we cannot evaluate the evidence on the Record, when it was not fully and fairly assessed by the ALJ in the first instance, as required by the applicable Regulations. We are not charged with assuming a fact-finder role, under the circumstances here, but rather, our function is to determine whether the ALJ properly exhausted his fact-finding duties in considering the Plaintiff's claim. Given the sparsity of the Record, as it relates to the ALJ's assessment of the Plaintiff's believability, we conclude that the ALJ did not, and accordingly, we recommend that his decision be reversed and

---

[12]Although the ALJ left the Record open, following the Hearing, in order to receive the Findings and Order of the Workers' Compensation Hearing that was held on July 8, 2005, and those documents were accepted into the Record on September 6, 2005, [T. 73-78], the ALJ did not consider those findings in rendering his decision. However, we find no error in this, as our Court of Appeals has found that such evidence is problematic, and of only questionable relevance in evaluating a claimant's credibility. See, Erickson v. Sullivan, 930 F.2d 654, 656 (8th Cir. 1991); cf., McKinney v. Apfel, 228 F.3d 860, 864 (8th Cir. 2000).

remanded to the Commissioner.  Notably, we parse the Commissioner's Memorandum in Support of Summary Judgment without finding so much as a reference to <u>Polaski</u>, or any serious attempt to justify the ALJ's believability assessments.  While the issue could be considered a somewhat close one -- given the formidable medical evidence of record which would be inconsistent with an award of benefits -- here, we find the deficiency in the ALJ's analysis to be more than an oversight in "opinion-writing technique."  See, <u>Johnson v. Apfel</u>, supra at 1149, citing <u>Carlson v. Chater</u>, 74 F.3d 869, 871 (8th Cir. 1996).

The absence of a principled assessment of the Plaintiff's believability fatally undermines much of the ALJ's fact-finding, inclusive of his RFC finding.  See, e.g., <u>Ellis v. Barnhart</u>, supra at 995-96 ("It is the ALJ's duty to determine an applicant's RFC," but "[b]efore doing so, the ALJ must determine the applicant's credibility, as his subjective complaints play a role in assessing his RFC."), citing <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217-18 (8th Cir. 2001).  Of course, we defer to the ALJ's credibility findings, "as long as they are 'supported by good reasons and substantial evidence,'" <u>Hamilton v. Astrue</u>, 518 F.3d 607, 613 (8th Cir. 2008), quoting <u>Pelkey v. Barnhart</u>, 433 F.3d 575, 577 (8th Cir. 2006), "[a]fter all, it is 'the statutory duty of the ALJ, in the first instance, to assess the credibility of the claimant.'" <u>Eichelberger v.</u>

Barnhart, supra at 589-90, quoting Harris v. Barnhart, 356 F.3d 926, 928 (8th Cir. 2004).

Lastly, we hasten to add that, in view of the Record presented -- and particularly the fairly normal daily routine that the Plaintiff has followed, and the conservative, yet successful, nature of the medical care prescribed for him -- our recommended reversal may merely result in further delay for, frankly, this Record does not strongly potentiate toward a finding of an intractable disability. Nevertheless, our view of the Record is necessarily constrained owing to the ALJ's failure to undertake an essential assessment of the Plaintiff's subjective complaints and, in the absence of that critical scrutiny, we should not usurp the ALJ's function and render our own believability findings.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Defendant's Motion [Docket No. 25] for Summary Judgment be denied.

2.     That the Plaintiff's Motion [Docket No. 18] for Summary Judgment be denied.

3.      That this matter be remanded to the Commissioner for further proceedings, in accordance with this Report, pursuant to Sentence 4 of Title 42 U.S.C. §405(g).

4.      That, pursuant to the holding in <u>Shalala v. Schaefer</u>, 509 U.S. 292, 297 (1993), Judgment be entered accordingly.


Dated:  July 15, 2008                          <u>s/Raymond L. Erickson</u>
                                               Raymond L. Erickson
                                               CHIEF U.S.  MAGISTRATE JUDGE


### NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **August 1, 2008**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **August 1, 2008**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.